UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

BECKY COOPER, )
 )
       Plaintiff, )
 ) No. 1:05-CV-111
v. )
 ) Judge Curtis L. Collier
 )
LIFE INSURANCE COMPANY OF NORTH )
AMERICA; ACE INA HOLDINGS, INC.; )
and ACE INA LONG TERM DISABILITY )
PLAN, )
 )
       Defendants. )
 )
 )

**MEMORANDUM**

On April 12, 2006, the Court heard oral arguments on Plaintiff Becky Cooper's ("Plaintiff") motion for judgment on the pleadings (Court File No. 22) and Defendants Life Insurance Company of North America ("LINA") and ACE INA Holdings, Inc.'s ("ACE") motions for judicial notice[1] (Court File No. 27, 29). LINA and ACE along with the ACE INA Long Term Disability Plan ("the Plan") will be collectively referred to as "Defendants."

This is a case where Plaintiff seeks benefits from the Plan and brings this action pursuant to 29 U.S.C. § 1132(a)(1)(B). The Plan is an employee benefit plan governed by the Employee

---

[1]Also before the Court are LINA's and ACE's motions for judicial notice (Court File No. 27, 29). Numerous filings have been made with respect to these motions (Court File Nos. 28, 30, 32, 33, 34, 35, 37, 38, 40, 41, 42, 45, 46). Among these filings are Plaintiff's motions to strike LINA's and ACE's motions for judicial notice or in the alternative motions in limine (Court File Nos. 34, 37).

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461. Because the subject matter involves a federal question and arises under ERISA, this Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e).

After carefully considering the very able arguments of counsel both at the oral argument and as advanced in their filings, and considering the applicable law, the Court will **DENY** Plaintiff's motion for judgment on the pleadings, **DENY** LINA's and ACE's motions for judicial notice as **MOOT**, and **DENY** Plaintiff's motions to strike or in the alternative motions in limine as **MOOT**. Further, the Court will **DISMISS** Plaintiff's claims and **DIRECT** the Clerk of Court to **CLOSE** this case.[2]

I. **STANDARD OF REVIEW**

Since this is an ERISA case involving denial of benefits, the Court's review is limited. In *Wilkins v. Baptist Healthcare Sys. Inc.*, 150 F.3d 609 (6th Cir. 1998), the United States Court of Appeals for the Sixth Circuit ("Sixth Circuit") set forth "suggested guidelines" for adjudicating ERISA benefit denial proceedings brought under § 1132(a)(1)(B). *Id.* at 619 (Gilman, J., concurring and delivering the opinion of the panel as to the applicability of summary judgment proceedings to ERISA cases). The proper procedure for adjudicating a § 1132(a)(1)(B) action is in the nature of a review of the administrator's decision at issue, not of a bench trial or a summary judgment determination. A bench trial, during which a court might evaluate evidence not before the plan

---

[2] Defendants did not formally file a motion for judgment on the record or any other dispositive motion. However, pursuant to the scheduling order, all parties are deemed to have moved for judgment in their respective favor based upon the administrative record (Court File No. 10, Scheduling Order, ¶ 4). Therefore, the Court may dismiss Plaintiff's claims even though Defendants have not filed a formal motion requesting the Court to do so.

2

administrator, would thwart Congress's goal of using ERISA "to provide a method for workers and beneficiaries to resolve disputes over benefits inexpensively and expeditiously" through an administrative procedure. *Wilkins*, 150 F.3d at 618 (quoting *Perry v. Simplicity Eng'g*, 900 F.2d 963, 967 (6th Cir. 1990)). Likewise, a summary judgment procedure is inapposite because the goal of its analysis is "to screen out cases not needing a full factual hearing." *Wilkins*, 150 F.3d at 619. Rather, a district court should review a benefits denial decision based "solely upon the administrative record" and "render findings of fact and conclusions of law accordingly." *Id.* "The district court may consider evidence outside of the administrative record only if that evidence is offered in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part." *Id.*

A denial of benefits decision "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57, 103 L. Ed. 2d 80 (1989). When discretionary authority is granted, "the highly deferential arbitrary and capricious standard of review is appropriate." *Borda v. Hardy, Lewis, Pollard, & Page, P.C.*, 138 F.3d 1062, 1066 (6th Cir. 1998) (quotation marks and citation omitted). Regarding the arbitrary and capricious standard, the Sixth Circuit explained "[t]his standard 'is the least demanding form of judicial review of administrative action . . . . When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious.'" *Abbott v. Pipefitters Local Union No. 522*, 94 F.3d 236, 240 (6th Cir. 1996) (quoting *Perry v. United Food & Commercial Workers Dist. Unions 405 & 422*, 64 F.3d 238, 242 (6th Cir. 1995)) . Under the arbitrary and capricious standard, the plan administrator's decision will be

3

Case 1:05-cv-00111 Document 48 Filed 05/30/06 Page 3 of 19 PageID #: 5

upheld if it was "rational in light of the plan's provisions," *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997), and was not made in bad faith. *Adcock v. Firestone Tire & Rubber Co.*, 822 F.2d 623, 626 (6th Cir. 1987). Although deferential, the arbitrary and capricious standard is "not no review" and "[i]t is not [] without some teeth." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003) (citations and quotations omitted). In reviewing an administrator's decision, the district court may only consider "the facts known to the plan administrator at the time he made his decision." *Smith*, 129 F.3d at 863.

Under the strictures of this review even if the Court would have made a different decision, the Court is required to uphold the decision so long as it was not arbitrary and capricious.

## II. RELEVANT FACTS

### A. The Plan

In ERISA cases, the first step is to consider the instrument creating the right to the claimed benefit, i.e., the Plan. For the Plan defines the benefits available and the mechanism for claiming the benefits.

Plaintiff was employed by ACE as a claims adjuster at all relevant times and by virtue of her employment with ACE, Plaintiff was enrolled in the Plan (*See* Court File No. 23, Summary Plan Description ("SPD"), p. 1).[3] Under the Plan, ACE is designated as the Employer, Plan Sponsor, and Plan Administrator (SPD at pp. 28-29). LINA is designated as the Claims Administrator (SPD at p. 30). The summary plan description ("SPD") grants the Plan Administrator "discretionary authority to administer [the Plan] in accordance with its terms, including the discretion to interpret

---

[3] As the Court understands it, before Plaintiff was injured, she worked as a claims adjuster for ACE from her home on a full-time basis.

4

the provisions of [the Plan] and determine the eligibility of each claim" (SPD at p. 33).[4] The insurer of the Plan is LINA (Administrative Record ("AR") at p. 211; SPD at p. 30). Pursuant to the insurance policy that governs the SPD,[5] the employee applying for benefits must "provide [LINA], at his or her own expense, *satisfactory* proof of Disability before benefits will be paid" (AR at p. 218 (emphasis added)).

The Plan provides instructions and policies related to the filing of a long term disability benefits claim and the appeal of a denial of a claim. An employee covered by the Plan may, if certain conditions are met, file an application for long term disability benefits by sending an application to the Claims Administrator (*See Id.* at p. 10, 19). The "benefit plan" is to "evaluate and process claims for benefits" within forty-five days of the claim being filed (*Id.* at p. 19). If the claim is denied, the employee has the right to appeal the denial and request a claim review (*Id.* at p. 20). The appeal must be in writing and filed with the Claims Administrator. The review is then "conducted by the Claims Administrator or other appropriate named fiduciary of [the Plan] . . . " (*Id.*) "No deference shall be afforded to the initial adverse benefit determination. The review shall take into account all comments, documents, records and other information submitted by the claimant relating to the claim *without regard* to whether such information was submitted or considered in the

---

[4] LINA is not the administrator of the Plan but it was the entity that made the initial and subsequent decisions to deny Plaintiff's claim for benefits. Plaintiff contended in her brief this fact required the Court to apply the *de novo* standard of review. However, at oral argument Plaintiff conceded the arbitrary and capricious standard of review was the appropriate standard of review.

[5] The SPD states "[t]he actual terms of [the Plan are] governed by formal plan documents or insurance contracts" (SPD at p. 33). The governing insurance contract relevant to this case is found in the AR at pages 211-233. Thus, for purposes of this memorandum when the Court refers to the Plan it is referring to the SPD and/or the insurance policy found in the AR.

5

initial benefit determination" (*Id.*) (emphasis added).

The Plan defines disability as follows:

The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is either:

1. unable to perform all the material duties of his or her Regular Occupation or a Qualified Alternative; or
2. unable to earn 80% or more of his or her Indexed Covered Earnings.

. . .

(AR at p. 214).

The Plan contains the following language in the section titled "Disability Benefits":

[LINA] will pay Disability Benefits if an Employee becomes Disabled while covered under this Policy. The Employee must satisfy the Elimination Period, be under the Appropriate Care of a Physician, and meet all the other terms and conditions of the Policy. He or she must provide [LINA], at his or her own expense, satisfactory proof of Disability before benefits will be paid.

(AR at p. 218). The Elimination Period is defined as "the period of time an Employee must be continuously Disabled before Disability Benefits are payable" (*Id.*). The Elimination Period under the Plan is 180 days (AR at p. 214).

Additionally, the Plan grants LINA "the right to examine any person for whom a claim is pending as often as it may reasonably require" (AR at 226). LINA did not exercise this right at any time.

**B. Plaintiff's Medical History & Treatment**

Plaintiff claims she is disabled under the policy because of problems she has with her back and neck. Plaintiff started complaining about pain in her back sometime in 2001. Her treating physician from June 2001 through October 2003 was Dr. Peter Boehm who is a neurosurgeon. In August 2001, Dr. Boehm evaluated Plaintiff and noted Plaintiff's right L5 nerve root was

6

compressed and the right L4 nerve root was effaced (AR at p. 512). He further noted there was a "marked intradiscal degenerative change and protrusion type herniation at L2-3" (*Id.*). A September 2001 nerve conduction study was performed that showed Plaintiff had a right L5 radiculopathy (AR at p. 510). Eventually Dr. Boehm recommended surgery and on May 3, 2002 Plaintiff underwent surgery. As a result, she stopped working and applied for short-term disability benefits. Her short-term disability claim was approved (AR at p. 19). Plaintiff was scheduled to return to work on September 25, 2002 (AR at p. 169).

After her surgery, Plaintiff continued to complain about pain in her back (AR at p. 492). On September 23, 2002 Dr. Boehm recommended she return to "work in the afternoon 2 to 3 hours a week gradually working into a longer schedule as her condition permits" (*Id.*; *see* AR at p. 495). In November 2002 Dr. Boehm again recommended Plaintiff continue the previously recommended work schedule (*Id.* at p. 488). On December 19, 2002 Dr. Boehm wrote, "At this point after attempting to work for 2 hours the pain is significant enough that [Plaintiff] can not carry on activities. In my opinion this patient is not capable of working for a full 8 hours" (*Id.* at p. 346). On January 13, 2003, Dr. Boehm recommended Plaintiff not pursue any work until some additional treatments were accomplished (*Id.* at p. 347).

Plaintiff was also treated by Dr. James Osborn for neck pain (*See, e.g.,* AR at p. 902). A form dated January 27, 2004 but signed on April 1, 2004 reads, "[t]he patient is temporarily and totally disabled from any gainful employment. The condition will be reassessed at the next examination" (*Id.* at p. 806). Plaintiff also saw Dr. Dennis Ford and Dr. R. Sean Brown for her pain. In January 2003 Dr. Brown, a physical medicine rehabilitation specialist, opined Plaintiff was unable to work at that time and in March 2003 he stated Plaintiff would not be able to perform her normal

7

job duties for eight hours per day (*Id.* at pp. 788, 799). In May 2003, Dr. Brown recommended Plaintiff not return to work until further notice (*Id.* at p. 803).

A magnetic resonance imaging ("MRI") examination was performed on December 9, 2002 and revealed multilevel degenerative changes with grade I spondylolisthesis at L5-S1; mild compression of the L5 root; a bulge in the right L3-4 and the left L2-3 neuroforamina; and marked intradiscal degenratie change and protrusion type herniation at L2-3 (*Id.* at pp. 305-06). A cervical spine MRI was performed in January 2003 and revealed Plaintiff had a large herniated disc at C5-6; spondylosis at C3, C4, C5, and C6; and bone spurring at C6-7 and C4-5 (*Id.* at 909).

At some point, Plaintiff filed for social security disability benefits. Her claim was approved in May 2004 and the original date of her disability was determined to be May 3, 2002 (*Id.* at pp. 727-30). Dr. Edward Johnson performed a physical examination and took X-rays. He noted on April 28, 2004:

> [Plaintiff] would have difficulty maintaining active employment other than sedentary brief periods of work She can occasionally lift and carry 10 pounds . . . . She can sit, stand or walk for two to three hours.

(*Id.* at p. 738). Dr. Johnson later noted Plaintiff could not work an eight-hour day or a forty-hour work week and Plaintiff could only sit three hours a day, 30-40 minutes at a time, and stand or walk 30 to 40 minutes at a time (*Id.* at p. 722-23).

### C. Plaintiff's Claim for Long-Term Disability Benefits

Plaintiff filed a claim for long-term disability benefits. Before making its decision, LINA informed Plaintiff it would need more medical information regarding her "functional abilities" from Dr. Boehm before December 6, 2002 (*Id.* at p. 165). Further, LINA requested Dr. Boehm and Dr. Ford to provide office notes and a physical abilities assessment ("PAA"). A blank PAA was sent

8

with the request (*Id.* at pp. 528-31, 534-37, 540-43). On December 2, 2002 Plaintiff was advised a definition of her functionality was needed from Dr. Boehm (*Id.* at p. 173). A letter dated December 5, 2002 was sent to Plaintiff explaining her claim had been denied (*Id.* at pp. 399-402). The letter states, "In reviewing your claim, [LINA] considered your claim file as a whole for purposes of determining your entitlement to policy benefits. . . . Without documented functionality, from your physician, we are unable to determine if you satisfy the policy definition of disabled" (*Id.* at p. 400).

Plaintiff timely appealed the decision (*Id.* at p. 403). In support of her appeal, Plaintiff submitted a partially completed PAA filled out by Dr. Boehm (AR at pp. 412-14). The PAA stated Plaintiff could lift ten pounds occasionally and should "restrict [] work hours to whatever her pain level permits" (*Id.* at p. 413).

Defendants hired Dr. Kenneth Graulich to conduct a peer evaluation and report whether Plaintiff was disabled. His report, dated March 18, 2003, summarized what he reviewed in conducting his peer evaluation (*See Id.* at pp. 253-56). He mentioned Plaintiff was allowed to return to work two to three hours per day on December 12, 2002 and a PAA was filled out on December 2, 2002 (*Id.* at p. 254). He stated he tried to contact Drs. Boehm and Brown on two occasions but his phone calls were not returned (*Id.* at p. 255). He concluded the medical records he reviewed did "not support [Plaintiff's] inability to work 10/20/02 through the present in a full-time sedentary position" (*Id.* at p. 256). Dr. Boehm also stated "restrictions and limitations of no more than 2-3 hours of work per day . . . would appear reasonable" but he limited this opinion based on the fact he was unable to reach Plaintiff's physicians and he did not have the results of a functional capacity evaluation ("FCE") (*Id.* at p. 256).

Plaintiff's appeal was denied on March 27, 2003 (*Id.* at p. 258). The denial letter explained

9

insufficient medical evidence was present to support Plaintiff's claim she could not perform light work after October 30, 2002 (*Id.* at p. 259). Plaintiff timely filed another appeal.

During the pendency of Plaintiff's second appeal, Defendants hired Dr. Eddie Sassoon to perform a peer review. Dr. Sassoon tried to contact Dr. Ford on two occasions but was unsuccessful (*Id.* at p. 707). On September 19, 2004 Dr. Sassoon summarized the documents he reviewed in making his conclusions (*Id.*). He specifically mentioned he considered Dr. Johnson's opinion Plaintiff could lift 10 pounds occasionally. He also noted Plaintiff was released to work part time in September 2002 and there "was no evidence that an updated EMG, nerve condition study, FCE, or updated radiologic scans or studies were performed to support clinical deficits in motor function or gait, standing or sitting" (*Id.* at pp. 708-09). He then concluded "there is no documentation that would preclude [Plaintiff] from performing full-time light occupation as of October 31, 2002" (*Id.* at pp. 709).

Plaintiff's second appeal was denied on September 28, 2004. The letter notifying Plaintiff of the denial summarizes Dr. Sassoon's findings and states Plaintiff is not disabled as that term is defined in the Plan (*Id.* at pp. 702-706).

### III. DISCUSSION

#### A. Appropriate Standard of Review

Plaintiff contends in her briefs *de novo* review is appropriate. However, at oral argument Plaintiff conceded the appropriate standard of review in this case is the arbitrary and capricious standard. Accordingly, the Court will apply the arbitrary and capricious standard of review.

Even though Plaintiff concedes the arbitrary and capricious standard should apply, she

10

requested at oral argument the Court take into account LINA was acting under a conflict of interest. *See Killian v. Healthsource Provident Admin'rs, Inc.*, 152 F.3d 514, 521 (6th Cir. 1998) (holding actual, readily apparent conflict of interest exists where same entity both funds and administers a plan). An inherent structural conflict of interest does not mandate *de novo* review of a benefits decision, but it does constitute a factor the Court must take into consideration in determining whether the decision was arbitrary and capricious. *Firestone*, 489 U.S. at 115; *Killian*, 152 F.3d at 521-22. However, the Sixth Circuit requires, in order to have the arbitrary and capricious standard tempered in any way, a plaintiff must first show not only the existence of a conflict of interest, but must also provide "significant evidence" the conflict affected or motivated the particular decision at issue. *See Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir. 1998) (impliedly rejecting sliding scale type approach); *see also Wages v. Sandler O'Neill & Partners, L.P.*, 2002 WL 339221, at *3 (6th Cir. Mar. 1, 2002) (unpublished) (stating requirement court take conflict into account "applies . . . only where there is 'significant evidence' that the insurer was motivated by self-interest"); *Jackson v. Metro. Life*, 2001 WL 1450811, at *2 (6th Cir. Oct. 29, 2001) (unpublished); *Cochran v. Trans-Gen. Life Ins. Co.*, 2001 WL 392050, at *3 (6th Cir. Apr. 13, 2001) (unpublished). Plaintiff has not provided any direct or circumstantial proof LINA's decision to deny benefits was motivated by self interest. Accordingly, to the extent any conflict of interest exists, the Court will only give the conflict the appropriate weight in its analysis.

### B. Merits of § 1132(a)(1)(B) Claim

Defendants argue LINA's initial and subsequent decisions to deny benefits were not arbitrary and capricious because Plaintiff did not submit satisfactory proof she was disabled as that term is defined in the Plan and as is required by the Plan. On this basis the Court concludes Defendants are

11

correct. Therefore, for the following reasons the Court will **DENY** Plaintiff's motion for judgment on the pleadings.

### 1.     Initial Denial

It is clear LINA's initial decision to deny benefits was not arbitrary and capricious. This decision was not made on the merits of Plaintiff's claim but rather her failure to supply information. Plaintiff filed a claim for long term disability benefits sometime in the Fall of 2002. Before making a decision, LINA requested Plaintiff to submit a completed PAA and informed her it needed a definition of her functional abilities before December 6, 2002. Further, LINA asked Drs. Boehm and Ford to complete a PAA so it could make a decision. Despite LINA's efforts, Plaintiff did not submit a PAA to LINA before December 6, 2002.

LINA has the right under the terms of the Plan to require a claimant to provide, at her own expense, satisfactory proof of disability. If such proof is not given, LINA has the discretion to deny the claim. This is a rational decision. When LINA requested Plaintiff and her treating physicians submit a completed PAA, it was simply trying to gather some objective medical evidence to determine whether it should approve or deny Plaintiff's claim. It is not unreasonable or irrational for a plan administrator or its agent to require a claimant to provide objective medical evidence of her disability. *See Boone v. Liberty Life Assur. Co. of Boston*, 161 Fed. Appx. 469, 473-74 (6th Cir. 2005) (slip opinion) (refusing to find the denial of benefits arbitrary and capricious where a plan administrator denied benefits for lack of objective medical evidence); *Greenberg v. Unum Life Ins. Co. of Amer.*, 2006 WL 842395, at * 10 (E.D.N.Y. March 27, 2006) (stating "it is reasonable for [a] company to prefer objective verifiable evidence over the self-reported symptoms of the insured"). Thus, when LINA denied Plaintiff's claim explaining she had failed to submit documented

functionality, its decision was not arbitrary and capricious.

Also, in denying Plaintiff's initial claim, LINA did not ignore the opinions of Drs. Boehm or Ford. In fact, LINA specifically stated in its denial letter the opinions of both doctors were considered. Although LINA ultimately discounted the opinions of these doctors because their opinions were based partly[6] on subjective evidence, particularly Plaintiff's complaints of pain, it was within LINA's discretion to do so. *See Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician . . . .").

In sum, the Court concludes LINA's decision to deny Plaintiff's initial claim for long term disability benefits was neither arbitrary or capricious.

### 2. Subsequent Denials

The parties offer several arguments in support of their respective positions as to why LINA's second and final decision to deny benefits was or was not arbitrary and capricious. In making these arguments the parties have raised several issues mostly concerning what the Court should and should not consider in determining whether Defendants' acted arbitrarily and capriciously. The Court will now address these issues and then explain why it concludes LINA's decisions were rational and supported by the record.

---

[6] The Court says partly because the AR includes some objective evidence of disability prior to Plaintiff's May 3, 2002 surgery. As previously outlined in this memorandum, prior to her surgery, Plaintiff's L5 nerve root was compressed, her right L4 nerve root was effaced, and she had degenerative disc disease and disc herniation at L2-3. The May 3, 2002 surgery was only intended to correct the L5 problems (Court File No. 31, p. 4). Hence, when Dr. Boehm recommended Plaintiff return to work for only a few hours a day in September 2002 he was likely considering both Plaintiff's subjective complaints of pain after the surgery and the objective evidence discovered before surgery.

13

### (a) Elimination Period

Defendants argued in their response brief and at oral argument Plaintiff's claim must fail because Plaintiff did not submit satisfactory proof of her disability, specifically a PAA, during the elimination period. This argument assumes an interpretation of the elimination period as that term is defined in the Plan with which the Court is unable to agree. The Court's reading of that definition persuades the Court that the elimination period is not a deadline for submitting evidence of a disability. Rather, the elimination period is clearly defined in the Plan as the length of time a person must be continuously disabled before she can become eligible for long term disability benefits. In other words, there is no requirement a claimant submit proof of her disability during the elimination period. Hence, even if Plaintiff did not show she was continuously disabled before December 2002, she could still satisfy the elimination period by later providing satisfactory proof she was continuously disabled for 180 days.

Assuming Defendants' interpretation of the elimination period were correct, however, their argument would still fail. The SPD provides any appeal of the initial denial of benefits will take into account all documents and records not previously submitted without regard to whether the information was previously submitted or considered.[7] Therefore, even though Plaintiff did not submit a PAA before the initial decision to deny benefits was made, the subsequently submitted PAA had just as much relevancy and force as if it had been submitted before December 6, 2002.

---

[7] Defendants' interpretation of the elimination period, if accepted, would, under the facts of this case, create a conflict between the insurance contract and the SPD because the SPD allows the submission of additional evidence of disability regardless of whether the evidence was available to a claimant before the initial decision was made. If the plan documents contradict the summary plan, the terms of the summary plan control. *Sprague v. General Motors Corp.*, 133 F.3d 388, 400-01 (6th Cir. 1998).

Accordingly, the Court rejects the idea that Plaintiff's initial failure to submit a PAA provides a justification for subsequently denying Plaintiff's claim for benefits.

### (b) File Reviewers vs. Treating Physicians

Plaintiff argues the Court should give much less weight to Drs. Graulich's and Sassoon's opinions because they are mere file reviewers who did not examine Plaintiff in person. This issue was recently addressed by the Sixth Circuit in *Kalish v. Liberty Mutual*, 419 F.3d 501, 508 (6th Cir. 2005). The Sixth Circuit stated:

> Whether a doctor has physically examined the claimant is indeed one factor that we may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician. . . . But "reliance on a file review does not, standing alone, require the conclusion that [a plan administrator] acted improperly."

*Id.* (citing and quoting *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005)). Accordingly, the Court will consider the fact Defendants primarily relied on their consulting file reviewers instead of Plaintiff's examining physicians in determining whether Defendants acted arbitrarily and capriciously.

### (c) Defendants' Failure to Hire a Physician to Examine Plaintiff

The Plan gives LINA the right to have its own physician examine Plaintiff. Yet, LINA never hired a physician to examine Plaintiff and instead relied on the opinions of two file-reviewing physicians who merely consulted Plaintiff's medical records in forming their opinions. The Sixth Circuit recently opined, "we find that the failure to conduct a physical examination – especially where the right to do so is specifically reserved in the plan – may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Calvert*, 409 F.3d at 295. The Court will take this factor into consideration in determining whether Defendants acted arbitrarily

and capriciously.

### (d) Weight the Court Should Give a Social Security Decision

Plaintiff argues the Court should give weight to the Social Security Administration's ("SSA") decision to grant Plaintiff social security benefits. Defendants respond the SSA's decision, while independent, was based on entirely different criteria and therefore should be ignored. The Court will not ignore the SSA's decision but rather will give it appropriate weight.

"[T]he SSA determination, though certainly not binding, is far from meaningless." *Calvert*, 409 F.3d at 294; *see also Whitaker v. Hartford Life & Accident Ins. Co.*, 121 Fed. Appx. 86, 88 (6th Cir. Jan. 24, 2005) (unpublished) ("we hold that an ERISA plan administrator is not bound by an SSA disability determination when reviewing a claim for benefits under an ERISA plan. . . . [E]ntitlement to Social Security benefits is measured by a uniform set of federal criteria. But a claim for benefits under an ERISA plan often turns on the interpretation of plan terms that differ from SSA criteria."). While the criteria in a SSA case is different and not binding on LINA, the SSA determination is a factor the Court will consider. However, as stated at the beginning of the opinion, the substantive and procedural right to benefits under an employee benefit plan is determined by the plan itself with some limitations as required by ERISA. Plans therefore will provide a myriad of different benefits and procedures that differ from Social Security.

### (e) Was LINA's Decision to Deny Benefits Arbitrary and Capricious?

After taking into consideration (1) all of the relevant evidence in the AR; (2) the terms of the Plan; (3) Plaintiff's obligations under the Plan; (4) Defendants' decision to discount the treating physicians' opinions in favor of two file reviewers; (5) Defendants' failure to hire a physician to examine Plaintiff; (6) the SSA's decision to grant Plaintiff social security benefits; and (7) the fact

16

four physicians who examined Plaintiff found she was unable to work full time, the Court concludes Defendants' decision to deny benefits, although a decision that others may not have made, was not arbitrary and capricious. Again, the question is not what this Court or some other third party would have done but rather whether Defendants' decision was rational.

The rationality of Defendants' decision is evident in the final denial letter dated September 28, 2004 (AR at pp. 702-06). The letter reads in part as follows:

> Dr. Sassoon reviewed all of the medical information contained in [Plaintiff's] claim file. . . . [Plaintiff] was released to return to work part-time by her surgeon in September 2002. . . . [T]he medical documentation supported [Plaintiff's] inability to perform her occupation frm May 3, 2002 through October 30, 2002, which was the period needed for [Plaintiff] to recover from her surgery. However, it was found that the medical documentation did not support [Plaintiff's] inability to perform her occupation from October 30, 2002 through present, as there was no updated [FCE] or evidence of acute neurologic or orthopaedic deficits documented to preclude light level work.
>
> . . . Dr. Sassoon noted that a repeat MRI on December 08, 2002 revealed multilevel degenerative changes with grade I spondylothesis at L5-S1, but no evidence of recurrent disc herniation or acute neurologic impingement. . . . [The] Cervical MRI revealed two-level disc protrusions at C5-6 and C6-7, but no evidence of acute neurologic impingement or myelopathy. Dr. Sassoon said that based on these findings, [Plaintiff's] condition would be consistent with chronic cervical and lumbar radicular pain and degeneration of the cervical and lumbar spine of moderate degree.
>
> Dr. Sassoon stated that the medical documentation does not support [Plaintiff's] inability to perform her full time occupation . . . from October 20, 2002 forward. No acute neurologic or orthopedic deficits . . . were documented to preclude [Plaintiff] from returning to work following adequate postoperative rehabilitation . . . .
>
> Dr. Sassoon stated there is no evidence of an updated EMG, nerve conduction study, FCE, or updated radiologic scans or studies . . . to preclude return to light level position as of October 30, 2002 forward.

(AR at pp. 703-05).

Dr. Sassoon reviewed all of the medical evidence in the record and determined there was not enough objective medical evidence present to determine whether Plaintiff was disabled. As already

17

explained, it is entirely rational for a plan administrator to deny benefits when there is a lack of objective medical evidence to support a claim for benefits. While the record clearly contains some objective evidence of Plaintiff's disability, Dr. Sassoon explains well why that evidence was not *satisfactory*. While the evidence submitted may very well have been enough for another file reviewer or decision maker to determine Plaintiff was disabled, the Court cannot say LINA's decision to deny benefits was arbitrary and capricious.

In addition, the Court accords significant weight, despite Defendants' incessant requests for objective medical evidence of Plaintiff's functional capabilities,[8] to Plaintiff's failure altogether to submit a FCE and submitted only a partially completed PAA. LINA made it very clear to Plaintiff what type of evidence it needed to make a decision but Plaintiff resisted or ignored LINA's requests and relied on the evidence she thought was satisfactory. The second denial letter specifically mentions the lack of a FCE in Plaintiff's medical records. Yet, by the time the final decision to deny benefits was made, which was over eighteen months after the second denial letter was sent to Plaintiff, she still had not submitted a FCE to LINA. Whether this should be attributed to her physicians or to Plaintiff, under the Plan it was her responsibility to furnish the information. Under well established ERISA law it is not for Plaintiff to determine that the proof she thinks is satisfactory is all that is necessary for the decision of whether benefits are payable. What is determinative is whether LINA believes the proof is satisfactory. Accordingly, the Court concludes LINA's decision

---

[8] Prior to the initial determination, LINA requested Plaintiff to provide a PAA or a definition of her functionality. In the initial denial letter, LINA informed Plaintiff her claim was being denied partly because her functional ability to lift, carry, walk, and stand had not been provided (AR at p. 400). In the second denial letter Plaintiff was informed without "a valid [FCE] relative to the period of 10/20/02 through the present [we are] unable to conclude that you were unable to perform at a light work level on a full-time basis" (AR at p. 259).

18

to deny benefits was rational and supported by the record.

### C.  Judicial Notice

Since the Court has found Defendants did not act arbitrarily and capriciously, it need not determine whether it should take judicial notice of statements made by Plaintiff and documents that are not in the AR.  Therefore, it will **DENY** LINA's and ACE's motions for judicial notice as **MOOT**.  Further, since the Court did not take into consideration the statements made by Plaintiff or any documents outside the AR, it will **DENY** Plaintiff's motions to strike or in the alternative as motions in limine as **MOOT**.

### III.   CONCLUSION

For the reasons already stated, the Court will **DENY** Plaintiff's motion for judgment on the pleadings (Court File No. 22), **DENY** LINA's and ACE's motions for judicial notice as **MOOT** (Court File Nos. 27, 29), and **DENY** Plaintiff's motions to strike or in the alternative motions in limine as **MOOT** (Court File Nos. 34, 37).  Further, the Court will **DISMISS** Plaintiff's claims against Defendants and **DIRECT** the Clerk of Court to **CLOSE** this case.

An Order shall enter.

**/s/**
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**